UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

HYUNDAI SUBARU OF NASHVILLE, )
INC., d/b/a DOWNTOWN HYUNDAI )
AND GENESIS OF DOWNTOWN )
NASHVILLE, )
                                                )
       **Plaintiff,** )
                                                )
   v. )    No. 3:22-cv-00817
                                                )
HYUNDAI MOTOR AMERICA, INC., )
and GENESIS MOTOR AMERICA, )
LLC, )
                                                )
      **Defendants.** )

## MEMORANDUM OPINION

Pending before the Court is Defendants' Motion to Dismiss the Amended Complaint (Doc. No. 42), to which Plaintiff has responded in opposition (Doc. No. 51) and Defendants have replied (Doc. No. 52). That motion will be denied.

**I.**

A summary of the relevant facts – drawn from the Amended Complaint and accepted as true – is as follows:

Hyundai Subaru of Nashville Inc. d/b/a Downtown Hyundai ("Downtown") sells Hyundai and Genesis vehicles out of its dealership located at 1412 Broadway in Nashville, Tennessee. The lease on that property will expire at the end of 2023, a fact that Hyundai Motor America, Inc. and Genesis Motor America, LLC (collectively "HMA") knew when they entered into virtually identical Sales and Service Agreement with Standard Provisions with Downtown that govern the parties' relationship.

In anticipation of the lease expiration, Downtown looked for a suitable, alternate location, and informed HMA of that effort two years ago. In response, HMA attempted to coerce Downtown into selling the dealership to it, or its preferred operator, rather than continue its relocation efforts.

Undeterred by HMA's resistance, Downtown found two potential sites in Nashville. The first was located at 1406 Brick Church Pike, which was within Downtown's Primary Market Area and a few minutes from its present location. The second was a 14-acre site at 1973 Southerland Drive that had unrestricted interstate views from I-65, was close to a competing Subaru dealership, and met all of HMA's land, square footage, visibility, and retail requirements. Both potential sites are located in primarily African American neighborhoods. Both were rejected by HMA.

Just seven days before closing, the first proposed location was rejected ostensibly because it (1) was not within the Metro Center/North Rhodes Park area, which HMA deemed to be an "acceptable alternative"; and (2) would move the Hyundai brand away from other competitive automotive brands. Approval for the second location was denied purportedly because HMA was not provided with enough detail to assess whether the location met Hyundai's and Genesis's brand standards, and also because it was only a mile away from the first proposed location. Moreover, months after Downtown began to look for an alternative site, HMA issued new guidelines that increased the lot and building sizes, and number of stalls requirements, all of which thwarted Downtown's relocation efforts.

Downtown asserts that HMA's vacillating reasons for denial and its stall tactics are disingenuous, but are in keeping with its redlining policy that can be seen in cities like Philadelphia, Pennsylvania; Chicago, Illinois; and Compton and Oakland, California. Those policies – requiring that Hyundai and Genesis dealerships be located in areas with certain demographics and nearby other

2

dealerships – effectively take African American neighborhoods out of the market for Hyundai dealers. Even though these policies may seem to be facially neutral, the intent and effect is discriminatory.

Additionally, or alternatively, Downtown insists that HMA's refusal to approve relocation is in keeping with its long-standing desire to replace Downtown's ownership with a new operator. That is, by continually changing its relocation requirements, HMA wants Downtown to sell or be put out of business.

The foregoing summary led to the filing of a two-count Amended Complaint. Count One alleges violation of the Automobile Dealer's Day in Court Act ("ADDCA"), 15 U.S.C. § 1222 *et seq.*, and constructive termination. Count Two alleges breach of contract and breach of the implied covenant of good faith and fair dealing. HMA moves to dismiss both counts under Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief can be granted.

## II.

To place HMA's arguments in context, a very brief primer on the ADDCA is appropriate. In relevant part, the ADDCA provides that an "automobile dealer may bring suit against any automobile manufacturer engaged in commerce . . . [to] recover the damages by him sustained and the cost of suit by reason of the failure of said automobile manufacturer to act in good faith in performing or complying with any of the terms or provisions of the franchise, or in terminating, canceling, or not renewing the franchise with said dealer." 15 U.S.C. § 1222. In such a suit, however, "the manufacturer shall not be barred from asserting in defense of any such action the failure of the dealer to act in good faith." Id.

"[T]o make out an ADDCA violation, four elements must be established: (1) that the plaintiff

3

is an automobile dealer; (2) that the defendant is an automobile manufacturer engaged in commerce; (3) that there is a manufacturer-dealer relationship embodied in a written franchise agreement; and (4) that the defendant manufacturer failed to act in good faith, thereby injuring the plaintiff dealer." Gen. Motors Corp. v. New A.C. Chevrolet, Inc., 263 F.3d 296, 325 (3d Cir. 2001). In most cases, the first three elements will be clear with the sole disagreement being whether the manufacturer acted in good faith within the meaning of the ADDCA.

Under the statute, "[t]he term 'good faith' [means] the duty of each party to any franchise, and all officers, employees, or agents thereof to act in a fair and equitable manner toward each other so as to guarantee the one party freedom from coercion, intimidation, or threats of coercion or intimidation from the other party." 15 U.S.C. § 1221. Thus, "[g]ood faith under the ADDCA is more limited than the general good faith standard." Turnpike Ford, Inc. v. Ford Motor Co., No. CIV A 205-CV-00398, 2008 WL 282791, at *8 (S.D.W. Va. Jan. 31, 2008) (citing David R. McGeorge Car Co. v. Leyland Motor Sales, Inc., 504 F.2d 52, 55-56 (4th Cir.1974)). "In order to succeed on a Dealers' Act claim, the dealer must demonstrate that the manufacturer exercised coercion or intimidation or made threats against the dealer . . . to achieve an improper or wrongful objective[.]" Adkins v. Gen. Motors Corp., 170 F. App'x 184, 188 (2d Cir. 2006) (quoting Empire Volkswagen v. World–Wide Volkswagen Corp., 814 F.2d 90 (2d Cir.1987)).

Obviously, and given the parties are free to contract as they will, it is not coercion within the meaning of the statute for a manufacturer "to merely enforce a provision of a contract." NACCO Materials Handling Grp., Inc. v. Toyota Materials Handling USA, Inc., 246 F. App'x 929, 939 (6th Cir. 2007) (citing Cecil Corley Motor Co. v. Gen. Motors Corp., 380 F. Supp. 819, 844 (M.D. Tenn.1974)). Further, "[t]here is nothing in [the ADDCA] which gives a dealer the right to dictate

4

the location of its own choosing" or "deprive [the manufacturer] of making business judgment as to locations of its franchises." Golden Gate Acceptance Corp. v. Gen. Motors Corp., 597 F.2d 676, 680-81 (9th Cir. 1979) (citations and internal quotation marks omitted). This is in keeping with the notion that a "distributor acting honestly is entitled to latitude in making commercial judgments." Saccucci Auto Grp., Inc. v. Am. Honda Motor Co., 617 F.3d 14, 23 (1st Cir. 2010) (citation omitted).

### III.

HMA advances several grounds for dismissal. Some of its arguments might have traction at the summary judgment stage but none are sufficient on a motion to dismiss where Downtown need only "allege enough facts to make it plausible that [HMA] bears legal liability." Agema v. City of Allegan, 826 F.3d 326, 331 (6th Cir. 2016). This is why:

**First**, HMA argues that "Downtown's two claims for 'constructive termination' both fail (Counts I-2)" because "Downtown is an open, operating dealership" and "[a]s a matter of law, it has not been 'constructively terminated' under the [ADDCA] or under common law." (Doc. No. 52 at 1). HMA claims that this is "black letter law, stated by numerous federal courts addressing automotive dealership disputes." (Id. at 1-2). HMA may be correct, just as it is clear that a constructive discharge claim generally will not arise until the employee is no longer working for the company. Regan v. Faurecia Auto. Seating, Inc., 679 F.3d 475, 481 (6th Cir. 2012) (stating that one of the elements of a Title VII constructive discharge claim is that "the employee actually quit."). However, without a tortured reading, the cases upon which HMA relies do not support the point it is trying to make, to wit, a dealer cannot bring an ADDCA claim if it is still in business, even if the manufacturer's actions will force the dealership to close.

5

For example, HMA argues that "in the closely analogous context of a gas station franchise agreement, the Supreme Court addressed this exact question, holding unanimously that 'a franchisee who continues operating a franchise' . . . has not had the franchise 'terminated in either the ordinary or technical sense of the word,' and thus could state no claim for 'constructive termination.' Mac's Shell Serv. Inc. v. Shell Oil Prods. Co., 559 U.S. 175, 183-84 (2010)." (Doc. No. 43 at 7). When Downtown pointed out in its response that Mac's Shell was decided under an entirely different statute, HMA deemed this to be a "distinction[] without a difference." (Doc. No. 52 at 2). HMA is wrong.

At issue in Mac's Shell was the Petroleum Marketing Practices Act ("PMPA") that limits the circumstances in which franchisors may terminate a service-station franchisee or "fail to renew" a franchise relationship. Indeed, "as relevant [t]here, the Act provide[d] that 'no franchisor . . . may . . . terminate any franchise,' except for an enumerated reason and after providing written notice." 559 U.S. at 130 (quoting 15 U. S. C. §§2802). The ACCDA's language, however, is not limited solely to termination and, unlike the PMPA, does not necessarily beg the question of what termination means.

HMA also relies on Bedford Nissan, Inc. v. Nissan No. Am., Inc., No. 1:16 CV 423, 2016 WL 6395799, at *10 (N.D. Ohio Oct. 28, 2016) for the "simple concept" that when a "franchise remains in operation there is no basis to claim termination [under the ADDCA], constructive or otherwise." (Doc. No. 43 at 10). However, the language in Bedford Nissan about plaintiffs continuing to operate their dealerships was made in relation to a claim that the dealer services agreement between the parties was violated, not the ADDCA. The actual ADDCA claim was dismissed elsewhere, but not because Bedford Nissan was an ongoing business. Rather it was

6

dismissed because plaintiffs had not shown the manufacture made a wrongful demand as required by the ADDCA.

Similarly, HMA misplaces reliance on Gen. Motors Corp. v. Dealmaker, LLC, No. 07-CV-141, 2007 WL 2454208, at *5 (N.D.N.Y. Aug. 23, 2007) as support for the proposition that "a manufacturer's denial of a relocation request, as a matter of law, is not a 'constructive termination' under the ADDCA." (Doc. No. 43). However, the precise quotation from Dealmaker on which HMA relies – "[t]he allegation that GM is attempting to put Seaway out of business by denying its relocation request is speculative and asserts an injury that has not yet occurred" – was made in the context of a specific provision of the New York Franchise Motor Vehicle Dealer Act relating to termination. Elsewhere, the Dealmaker court allowed a claim to go forward under a different provision of that act because "Seaway assert[ed] that GM unreasonably restricted its site change request in order to put it out of business[.]" Id. at *6.

Regardless, the ADDCA "provides automobile dealers with a federal cause of action against automobile manufacturers who fail 'to act in good faith in performing or complying with any of the terms or provisions of the franchise *or* in terminating, canceling, or not renewing the franchise with said dealer[.]'" George Lussier Enterprises, Inc. v. Subaru of New England, Inc., 393 F.3d 36, 42 (1st Cir. 2004) (emphasis added) (quoting 15 U.S.C, §1222); accord Gen. Motors Corp. v. New A.C. Chevrolet, Inc., 263 F.3d 296, 325 (3d Cir. 2001); Randy's Studebaker Sales, Inc. v. Nissan Motor Corp. in U.S.A., 533 F.2d 510, 514 (10th Cir. 1976); Overseas Motors, Inc. v. Imp. Motors Ltd., Inc, 519 F.2d 119, 123 (6th Cir. 1975). Whatever alternative state law remedies might be available, the ADDCA itself "is a remedial statute enacted to redress the economic imbalance and unequal bargaining power between large automobile manufacturers and local dealerships, protecting dealers

7

from unfair termination *and other retaliatory and coercive practices*." Northview Motors, Inc. v. Chrysler Motors Corp., 227 F.3d 78, 92 (3d Cir.2000) (emphasis added). Unlike the PMPA at issue in Mac's Shell, its focus is not solely on termination and allows recovery for a plaintiff that has been "injured by the defendant's failure to act in good faith." Id. at 93; accord, Maschio v. Prestige Motors, 37 F.3d 908, 910 (3d Cir. 1994); Sherman v. British Leyland Motors, Ltd., 601 F.2d 429, 441 (9th Cir.1979).

**Second and Third,** HMA argues that "Downtown's allegations are insufficient to plead a breach of the ADDCA's duty of good faith" and "ADDCA claims on relocation disputes are routinely dismissed for lack of an actionable 'wrongful demand.'" (Doc. No. 43 at 12-13). The "routine dismissal" argument is based on four cases: Dealmaker, 2007 WL 2454208; Conklin Fangman Kansas City, LLC v. Gen. Motors, LLC, No. 4:21-CV-0001-DGK, 2021 WL 5889981 (W.D. Mo. Dec. 13, 2021); Mathew Enter., Inc. v. FCA US, LLC, No. 16-CV-03551-LHK, 2016 WL 6778534 (N.D. Cal. Nov. 16, 2016); and Golden Gate, 597 F.2d 676. Each case presents facts and/or situations entirely different from those presented here.

In Dealmaker, the ACCDA relocation claim was dismissed because (1) its substance was based on "one conclusory statement: 'GM has coerced and damaged [Seaway] by refusing, without sufficient reason, to permit [Seaway's] relocation'"; (2) there was "no allegation of any demand, let alone a wrongful demand, by GM"; and (3) there was "no factual allegation upon which a fact finder could conclude that GM's decision to deny the relocation was an exercise of intimidation or coercion." 2007 WL 2454208, at *5. Similarly, in Conklin, only one paragraph was needed to resolve the ADDCA claim because (1) the "complaint includes no allegations that GM made any demand upon Plaintiff"; (2) plaintiff "d[id] not plead sufficient facts to show coercion or

8

intimidation" and the (3) "complaint d[id] not allege that GM threatened Plaintiff. Plaintiff therefore fails to state a claim for violation of the ADDCA." 2021 WL 5889981, at *6. In Mathew, the court found that plaintiff "failed to adequately allege a claim under the ADDCA," 2016 WL 67778534 at *6, but then granted leave to amend, thereby undercutting HMA's implied suggestion that a failure to allow relocation cannot sustain a claim under the ADDCA. Finally, in Golden Gate, a claim by the dealer that it was wrongfully denied relocation was rejected because the parties had agreed on a site only to have the dealer revise the terms and present it to the manufacturer as a "*fait d' accompli*." 597 F.2d 676, 677. Even then, however, dismissal was not granted until summary judgment, "after two years of discovery by the parties[.]" Id.

The allegations here are not the sort of "[t]hreadbare recitals . . . of a cause of action," Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009), apparently at issue in cases like Dealmaker, Conklin, and Mathew. Even considering that "[t]he type of coercion or intimidation rendered actionable under the ADDCA occurs only when the automobile manufacturer makes a 'wrongful demand which will result in sanctions if not complied with,'" New A.C. Chevrolet, 263 F.3d at 326 (citation omitted), Downtown paints a sufficiently detailed picture to "open the door of discovery, Iqbal, 556 U.S. at 678. This remains so, even though HMA sets forth seemingly acceptable reasons why relocation has not been approved. See, 16630 Southfield Ltd. P'ship v. Flagstar Bank, F.S.B., 727 F.3d 502, 505 (6th Cir. 2013) (stating that "the availability of other explanations—even more likely explanations—does not bar the door to discovery").

According to the allegations in the Amended Complaint, HMA (knowing full well that Downtown's lease was expiring) began its coercion tactics by presenting Downtown with an already written sales agreement that would place the dealership in the hands of HMA's preferred operator.

9

Instead of acceding to HMA's wishes (or perhaps demands), Downtown looked elsewhere, only to be stopped at every turn. It began when Downtown proposed a site only minutes from its present location but, on the eve of closing, HMA rejected the proposal based on reasons that had never previously been mentioned to Downtown. It continued when Downtown presented a seemingly appropriate second site, but this was rejected when HMA claimed it lacked enough details, even though Downtown had provided that information and included a market study. Next, HMA proposed a site to Downtown, but the price for the parcel was more than what any reasonable dealer would pay and was not even large enough to meet HMA's guidelines. These snippets of allegations from the Amended Complaint, when construed in HMA's suggests more than a runaround. It suggests HMA failed to act in good faith, even as that term has been narrowly defined under the ADDCA. And this does not even take into account the allegations that HMA has a history of redlining dealerships away from African American neighborhoods.

**Fourth and finally,** HMA argues that "[e]ven if th[e] redlining allegation w[as] entitled to the presumption of truth (and it is not), it does not support a claim because it is flatly contradicted by the very demographic data that Downtown feature in the Amended Complaint." (Doc. No. 43). No doubt, "[a] litigant may plead itself out of court,'" Rouse v. Stacy, 478 F. App'x 945, 959 (6th Cir. 2012), but HMA's argument fails to account for the allegation that the lot it proposed in an African American community cost far too much and was too small under HMA's own standards. It also fails to acknowledge Downtown's alternative argument that HMA was acting in bad faith so as to run Downtown out of business in favor of a preferred operator.

### IV. Conclusion

On the basis of the foregoing, HMA's Motion to Dismiss Downtown's Amended Complaint

10

will be denied. With the doors of discovery open, the matter will be returned to Magistrate Judge Newbern for further pretrial case management.

An appropriate Order will enter.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE